# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

KENNETH A. CANDLER,                    :

    Plaintiff,                         :

                                 Case No. 3:12cv00181

vs.                                    :

                                 District Judge Thomas M. Rose

CAROLYN COLVIN,                        :   Chief Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,               :

    Defendant.                         :

# REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Kenneth A. Candler underwent brain surgery in 2007 to repair damage caused by an aneurysm. He now has a seizure disorder and left-shoulder problems caused by a seizure he suffered in late 2007.

In March 2008, Candler applied for Disability Insurance Benefits (DIB) with the Social Security Administration, asserting that he was under a benefits-qualifying disability starting on June 5, 2007. After various administrative proceedings, Administrative Law Judge (ALJ) Carol K. Bowen denied Candler's DIB application based on her conclusion that Candler's impairments did not constitute a "disability" within the meaning of the Social Security Act. This Court has jurisdiction to review ALJ Bowen's decision. *See* 42 U.S.C.

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

§405(g).

This case is before the Court upon Candler's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), Candler's Reply (Doc. # 11), the administrative record (Doc. # 6), and the record as a whole.

## II.    "Disability" Defined

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. An applicant for Disability Insurance Benefits bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

## III.    Background

### A.    Vocational Profile, Brain Aneurysm, and Testimony

Candler was 45 years old on his alleged disability onset date and is thus considered to be a "younger individual" for purposes of resolving his DIB claim. *See* 20 C.F.R. §404.1563(c). He has a high school education.

From June 3, 2007 until June 19, 2007, Candler was a patient at the University of Cincinnati's University Hospital. Upon his arrival, he was suffering a severe headache (the "worst headache of his life" (Doc. #6, PageID at 360)), and nausea, and he had experienced multiple episodes of vomiting earlier that day. A head CT scan revealed a hemorrhagic mass right frontal lobe..., subtle mass effect, + subdural subarrachnoid hemorrhage, likely complicated vascular malformation or tumor." *Id*. PageID at 258, 265. Candler was placed on anticonvulsant medication. Before undergoing brain surgery, Candler experienced "seizure like activity and did vomit ...." *Id*., PageID at 360. He underwent brain surgery, "a prolonged operative course," specifically a resection of a right frontal AVM (ateriovenous malformation). *Id*., PageID at 360, 384. During the surgery, surgeons attached aneurysm clips, presumably to stop and prevent further bleeding, in the right-frontal-medial lobe of Candler's brain. *Id*., PageID at 294.

After surgery, Candler needed "ventilatory support" because he developed "pneumonia and acute lung injury and ARDS [acute respiratory distress syndrome]."[2] (Doc. #6, PageID at 360). Hospital records explain, "Due to the patient's changing and worsening lung status, at this time he did receive a tracheostomy and was eventually weaned from his high vent settings. The patient was continued on adequate sedation for his ventilatory support, but his neuro status was monitored daily and continued to improve." *Id*. Before his discharge from the hospital, he recovered from the pneumonia but still needed "ventilatory

---

[2] Taber's Cyclopedic Medical Dictionary , p. 2369 (19th Ed. 2001).

3

support at night." *Id*. Hospital records further explain that post-surgical head CTs did not show "any worsening edema... bleeding." *Id*. And hospital records report, "In terms of the patient's neuro status, he has returned to baseline functioning, moving all extremities..., following commands. The patient will be continued on antiseizure medications per Neurosurgery as he did have a seizure prior to his operation." *Id*. Candler's medications upon his discharge from the hospital included Keppra, a prescription antiepileptic-seizure medication.[3] (Doc. #6, PageID at 360, 385).

During the ALJ's hearing in June 2010, Candler testified that he lived with his wife. He no longer drove; his wife drove him to the ALJ's hearing. He is a military veteran, and the time of the ALJ's hearing, he received medical services through the U.S. Veterans' Administration.

Candler's past employment mainly involved his work as the purchasing manager for a plastics molding company. He was in charge of ordering supplies that his employer used in the products it provided to General Motors. (Doc. #6, PageID at 70).

After Candler's first hospitalization for brain aneurism in June 2007, he attempted to return to his purchasing-manager job. He testified, however, that he could not keep up with the demands of his former job. *Id*., at 71-72. He was last employed at the plastics molding company in January 2008.

He later tried to work on Fridays and Saturdays as a third-shift attendant at Project

---

[3] http://www.nlm.nih.gov/medline (search for "Keppra" in MedlinePlus/Drugs & Supplements database).

Cure, where his wife worked. The work attempt lasted four months before he was terminated because he had a seizure while on the job. *Id.*, PageID at 68-69,  80-81.

Candler testified that he has taken Keppra since his brain aneurysm in June 2007. Candler continued, "on the Keppra, it started out – when I first got sick, they were trying to wean me off the medication and the day that they weaned me off the medication, I had a major seizure. So they ... increased it some." (Doc. #6, PageID at 72). At the time of ALJ Bowen's hearing, Candler was taking 1500mg of Keppra in the morning and 1500mg of Keppra in the evening. He took Keppra in combination with 300mg Dilantan, a prescription "anticonvulsant."[4] And he took Hydrocodone for his left-shoulder pain, aspirin for his heart, and a medication for diabetes. *Id.*, PageID at 72-73.

Candler agreed with his attorney's description of the 3,000mg of daily medication (Keppra) Candler takes as "pretty a extreme dose ...." *Id.*, PageID at 81. When asked what doctors have told him about this dose, Candler understood that "[t]he reason for that much seizure medication is pretty much to keep me at a level where they [his doctors] feel comfortable that it's controlling the seizures. But, you know, at any given time, even with the 1,500 milligrams of seizure medication, a seizure can happen ...." *Id.*, PageID at 81. As of June 2010, the last seizure Candler suffered had occurred in 2008. *Id.*, PageID at 74.

The side effects Candler experienced from his medications included daily sleepiness. He took one dose of his medications in the morning at about 8:00a.m. *Id.*, PageID at 75.

---

[4] http://www.nlm.nih.gov/medline (search for "Dilantin" in MedlinePlus/Drugs & Supplements database).

After about an hour, he would get sleepy and "normally ... [would] lay down for a few hours to rest." *Id.* PageID at 73 , 77, 82. He also took a second dose of his medications in the evening, normally around 9:00 p.m., and would then go to sleep. During the ALJ's hearing, Candler was asked, "Do you fall asleep during the day?"; he answered, "Yes, especially with the medication." *Id.*, PageID at 82. He has needed these two-to-three hour naps since he began taking the medications. *Id.* He further testified, "They tried to wean me off the medication, but ... I had more seizures." *Id.*, PageId at 82.

When Candler experiences a seizure, he is in danger of physical injury. Such an injury occurred in December 2007. He testified:

> I was in bed sleeping. I had a seizure, and my arm got caught between the headboard and mattress of the bed. I dislocated it. They took me to Sycamore Hospital, while ... I had the seizure. They gave me medication, and then they popped my shoulder back into place ....

(Doc. #6, PageID at 74). Candler went to physical therapy but apparently did not improve significantly. In March 2010, he underwent left-shoulder surgery. At the ALJ's hearing several months later, Candler maintained that he could not lift his left arm without using his right arm for help. *Id.*, PageID at 75.

Candler testified that he typically woke up about 8:00 a.m. to take his medications and that he needed to take his medications on schedule. He explained, "I'm afraid if I get off the schedule, something'll happen." *Id.* He then explained:

> So either my ... daughter'll be at the house, or my nieces, my nephews, someone'll be there at the house to make sure I'm taking my medication, to watch over me during the day. Even at night, if my wife's not there, someone's always gonna be there at home with me. I pretty much don't go anywhere by

6

myself, mainly because I'm really afraid to be out in a large crowd, being around a whole lot of people. I used to go to basketball games, but I even stopped going to those. I used to, before I got sick, I used to officiate baseball, which I loved. Fast-pitch softball for the girls, and baseball for the men out .... And I loved that, but I can't do it anymore because ASA [Amateur Softball Association of America] rules state that if a person was sick or injured, they're insurance doesn't cover you being out there on the baseball diamond, something happens to you like that.

*Id*., PageID at 75-76. Candler was asked, "What caused you to have those seizures, do you have any recollection?"; he answered, "They just pop up, you know, I have – really haven't – really never been sick to this magnitude of anything, and – but I don't know why they just pop up." *Id*, PageID at 83.

During the day, Candler did not do housework or prepare meals.  He likes to read and reads "some part of the newspaper," but his "concentration level is really not into it."  *Id*., PageID# at 77.  He would not visit friends unless somebody went with him. If he went a movie, he would need his wife to take him. *Id*., PageID at 78. He watches some television and is able to bath and dress himself. He tried to lift a gallon of milk with his left arm, but it "didn't work out too well." *Id*., PageID at 79.  He noted, "they don't want me to lift really too much with my right [arm] because of the injury to my head, you know, I still have clips in my brain. They really don't want me to lift anything that may cause ... things to go wrong again." *Id*., PageID at 79.

Candler testified that when he tried to take a walk, he could walk "maybe two or three blocks" before he would get tired, winded, and needed to sit.  *Id*., PageID at 82.

**B.** **Angela Candler's Testimony**

Candler's wife, Angela Candler, testified during ALJ Bowen's June 2010 hearing.

(Doc. #6, PageID at 87-92). She described the differences in her husband's condition before

and after the 2007 brain aneurysm. Mrs. Candler characterized the differences as "a real big

drastic change." *Id*., PageID at 89. She stated that before the aneurysm, Candler was an

active, busy, socially engaging person. She explained, "he was real active. He loved to work.

He used to work 16, 18 hours a day.... [H]e was never at home .... And he always played

with the grandkids .... He officiated softball, which he loved to do.... And I mean, ... he was

just a real outgoing guy." (Doc. #6, PageID at 88-89). Mrs. Candler continued:

> [H]e really can't pay attention a lot. If I would give him certain things to do if
> I'm at home..., he'll forget to do it. He used to help me around the house a lot;
> he can't do that anymore. I can't leave him alone. When I'm at work or am at
> school, I have to have someone sitting there with him: his children or one of
> my children, or I would take him over to his sister's house, and she would sit
> with him until I get  back from school or get off work.

*Id*., PageID at 89. Candler was a "math whiz" – Mrs. Candler's "calculator. But now he

can't really, you know, think as fast, since the surgery and stuff, as fast as he used to. And ...

I could tell him one thing or he could ask me a question, and then like a half an hour later,

he'll come ask me back the same question. And I'll say, 'Well, I just answered that question

for you a few minutes ago," and he'd be like, "I don't remember that I asked you that. So

him memory skills [are] not that good anymore." *Id*., PageID at 90. Mrs. Candler further

testified, "I'm always around Kenneth. Even if I am at work, I always constantly call to

make sure that he's okay...." *Id*., PageID at 91.

When asked if she thought Candler was capable of working, Mrs. Candler testified "if he could work, honestly, he would work. But Kenneth is not capable of working anymore." *Id*., PageID at 92.

**C.** **Vocational Expert Testimony**

Vanessa Harris, Ph.D. testified as the vocational expert (VE) at the administrative hearing. She stated that Candler's past relevant employment as a production manager and stock control clerk were both at the skilled, light exertional level. His job as a security guard involved semi-skilled and light exertional work. His jobs as a procurement services manager and safety manager were both at the skilled, sedentary exertional level.

ALJ Bowen asked the VE a series of hypothetical questions based on Candler's work limitations. The ALJ asked the VE to consider a hypothetical person of Candler's age, education, and work background who was limited to lifting ten pounds with the left arm; only occasional pushing or pulling with the left arm; frequent climbing ramps or stairs but never ladders, ropes, or scaffolds; frequent stooping, kneeling, and crouching but no crawling; no overhead reaching and no repetitive reaching otherwise with the left arm; no exposure to hazardous machinery or unprotected heights; no driving as part of the job duties; and mentally, Candler could perform work consisting of only simple, routine, and repetitive tasks. (Doc. #6, PageID at 95-96).

The VE acknowledged that such a hypothetical person could not perform Candler's past relevant work but that other light, unskilled jobs would be available in the region such as a paper inserter, table worker, and lens inserter, with approximately 4,000 jobs. *Id*.,

9

PageID at 96.

The VE further testified that her testimony was consistent with the Dictionary of Occupational Titles with the exception of the need to not drive. The jobs she identified are not jobs where an individual would be required to drive as an essential function of the job. In addition, the VE testified, "the lifting of 10 pounds at the light level, again, the Dictionary of Occupational Titles identifies light jobs up to 20 pounds, and so that would be different." *Id*., PageID at 97.

When cross-examined by Candler's counsel, the VE acknowledged that if the hypothetical person described by the ALJ also needed to lie down and rest for at least an hour to an hour and a half per day, the limitations "would eliminate ... all jobs in the national economy. Employers do not tolerate ... that level of off-task behavior. *Id*., PageID at 100.

### D. <u>Relevant Medical Opinions</u>

Turning to the other evidence and other information in the administrative record, Candler and the ALJ have provided informative and detailed descriptions of that evidence. *See* Doc. #7, PageID at 1099-1101; Doc. 6, PageID at 49-53. In light of this, and upon consideration of the complete administrative record, additional detailed discussion of the record would be unnecessarily duplicative.

**IV.    ALJ Bowen's Decision**

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential evaluation answers five questions:

1.    Has the claimant engaged in substantial gainful activity?

2.    Does the claimant suffer from one or more severe impairments?

3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.    Considering the claimant's residual functional capacity, can she perform her past relevant work?

5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

20 C.F.R. § 404.1520(a)(4); *see Ealy v. Comm'r of Social Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).

ALJ Bowen's pertinent findings began at Step 2 of the sequential evaluation where she concluded that Candler has the severe impairments of "seizure disorder with residuals of multiple aneurysms and neurosurgery; left rotator cuff arthroplasty; arrhythmia." (Doc. #6, PageId at 49). The ALJ determined that Candler's diabetes and high cholesterol are not severe impairments.

The ALJ concluded at Step 3 that Candler did not have an impairment or combination

11

of impairments that met or equaled one in the Listings.

At Step 4, ALJ Bowen concluded that Candler retained the residual functional

capacity to perform light work[5] except that he is limited to the following:

- lifting a maximum of ten pounds with his left arm;
- only occasional pushing or pulling with his left arm;
- frequent climbing ramps or stairs, but never ladders, ropes or scaffolds;
- frequent stooping, kneeling and crouching, but no crawling;
- no overhead reaching and no repetitive reaching otherwise with the left arm;
- no exposure to hazardous machinery or unprotected heights;
- no driving as part of the job duties; and
- work consisting of only simple, routine and repetitive tasks.

(Doc. #6, PageID at 50). The ALJ further concluded at Step 4 that Candler was unable to

perform his past relevant work. At Step 5, the ALJ concluded that there are jobs existing in

significant numbers in the national economy that Candler can perform.

The ALJ's findings throughout her sequential evaluation led to her ultimate

conclusion that Candler was not under a disability and, therefore, not eligible for DIB.

## V.    __Judicial Review__

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir.

2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or

---

[5] The Regulations define light work as involving the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds..." 20 C.F.R. §404.1567(b).

disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## VI.   Discussion

### A.   The Parties' Contentions

Candler contends that the ALJ erred in her assessment of Candler's symptoms by

failing to consider the side effects from his seizure medications.  He points out that although the ALJ found his testimony to be credible, the ALJ "disregarded the side effects of chronic medication use following a brain aneurysm." (Doc. #7, PageID at 1098). Candler also argues that the ALJ 's hypothetical question to the VE did not accurately portray Candler's limitations because she failed to include any limitations based on the established side effect of his medication-induced sleepiness that is secondary to the his use of Keppra and Dilantin. *Id.*, PageID at 1104.

The Commissioner asserts that substantial evidence supports the ALJ's decision. The Commissioner reasons that the ALJ accounted for Candler's medication side effect – sleepiness – in her assessment of Candler's residual functional capacity by limiting him to work that did not require driving, exposure to hazardous machinery or unprotected heights, and was simple, routine, and repetitive in nature. The Commissioner further contends that the ALJ's complete hypotheticals to the vocational expert fully accounted for Candler's medication side effect of sleepiness.

### B.  <u>Analysis</u>

Candler relies heavily on his testimony that about one hour after he takes his medications, "I'm getting sleepy. So I normally, you know, lay down for a few hours to rest." (Doc. #6, PageID at 73). He further testified that an average nap he takes lasts "about 2 hours to 3 hours a day" after he takes his medications. *Id.*, PageID at 77, 82.

The ALJ's decision did not specifically address this testimony. Instead, the decision merely recognized that the Candler's medications make him "very sleepy." Specifically, the

14

ALJ wrote:

> [Candler's] current medication regimen appears to be controlling the seizures as it has been over 1 year; however, he indicated his medication makes him very sleepy. Hazard precautions and no driving are incorporated into his residual functional capacity. He is also restricted to simple, routine, repetitive tasks due to both his mediations [sic; presumably, "medications"] and subjective reports of memory issues ....

*Id*. Contrary to the Commissioner's argument, these limitations do not account for Candler's testimony that about an hour after he takes his medications, he needs to lie down and that he sleeps an average of two to three hours per day since he began taking his medications. (Doc. #6, PageID at 73, 77, 82). Assuming as the ALJ found that Candler cannot perform jobs requiring him to drive or work around hazardous machinery or hazardous conditions and was limited to simple, repetitive work, these limitations leave open and unaddressed his need to lie down after taking his medications and his need to nap for two to three hours because of medications. Indeed, how would the ALJ have addressed this limitation in her assessment Candler's residual functional capacity except to have concluded that Candler was limited to work that allowed him to lie down and nap up to two or three hours per day. Candler's credibility on this point thus becomes the crux of this case.

"There is no question that subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) (citations omitted). In the present case, the objective medical evidence establishes that Candler suffers from a seizure disorder, and it is undisputed that he takes Keppra, a prescription antiseizure

medication. There is also no dispute that Candler's medications cause him to become "very sleepy" at the very least, as the ALJ recognized.

Resolving the parties' controversy thus requires close consideration of the ALJ's finding that medications cause Candler to become "very sleepy" rather than also crediting his testimony that his medications cause him to lie down and nap up to two or three hours per day. The case at this point becomes somewhat unusual because the ALJ found Candler at his wife mostly credible. The ALJ wrote:

> [Candler] testified he never stays alone or goes places alone. He does no housework, fixes only microwaveable foods, watches TV or reads, but has trouble paying attention. He used to have hobbies like officiating in softball games, but is unable to do that anymore because he is uninsurable through the league, and per Exhibit 5E [Doc. 6, PageID at 221], and cannot keep up. He collected unemployment through 2009, which is somewhat inconsistent with current statements of disability, but generally speaking, his subjective complaints and his wife's testimony was credible and he does have an excellent work history as well as attempts to return to work, which enhance his credibility. There is no doubt that there have been some relatively dramatic changes in lifestyle and abilities, but overall he testified well when asked questions and overall his impairments would not appear to preclude the modified range of light, unskilled work.

(Doc. #6, PageID at 52). Mostly credible but not fully credible. The ALJ reasoned:

> Claimant alleges disability due to residuals of brain aneurysm with memory loss, a seizure disorder, and a left shoulder injury (that occurred during a seizure in December 2007). However, on an April 28, 2008 functional report, he reported that he watched TV and read. He could handle his personal care. He takes out the trash, shops with his wife, walks 1-2 miles, and can focus on things for 10 to 15 minutes. He is able to finish what he starts and can follow spoken instructions. He gets along well with others. While he is limited by his impairments, his limited functional capabilities would not preclude all work activity.

(Doc. #6, PageID at 51).

16

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 475 (citing, in part, *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir.1997) (other citation omitted). "In addition, the ALJ can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate." *Jones*, 336 F.3d at 475 (citations omitted). "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531. "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.*

Although ALJ Bowen's decision does not specifically explain why she did not credit Candler's testimony that his medications causing him to lie down and nap up to two or three hours per day, the ALJ appears to have rejected this testimony based on his statements in his April 2008 functional report. Yet none of those statements provide a reasonable evidentiary basis for discounting Candler's testimony about his medication side effect. Many of Candler's statements in the April 2008 functional report, upon which the ALJ relied, are consistent with his testimony during the ALJ's June 2010 hearing. Just like Candler indicated in his functional report (Doc. #6, PageID at 218, 221), he testified before the ALJ that he watches television, takes care of his personal grooming, and dresses himself. *See supra*, §III(A). Candler also testified that he reads, *id.*, as he acknowledged in his functional

17

report. (Doc. #6, PageID at 218, 221). He further testified that he only reads "some parts of the newspaper" then he ends up "putting it back down 'cause [his] concentration level is really not into it." *Id.*, PageID at 77. This does not conflict with Candler's functional report in which he indicates that he can pay attention for 10 to 15 minutes. *Id.*, PageID at 222. Although Candler reported that it takes him five minutes to take out the trash, *id.*, PageID at 220, such minimal activity does not conflict with the minimal daily activities he performs. He told the ALJ, for example, that he does not do housework; he does not fix meals (or at most fixes TV dinners) – his daughter cooks a lot for him; he is not able to do anything with his "grandbabies" when they visit; he is visited by friends and family but is only able to visit them if someone goes with him; his wife takes care of the finances; and he only goes out to eat or to a movie if his wife goes with him. *Id.*, PageID at 75-78. As the ALJ noted, Candler indicated in his functional report that he goes food shopping with his wife. But the ALJ overlooked that Candler's further indication that shopping takes about an hour and he "gets tired quickly." (Doc. #22, PageID at 220). Again, this information does not conflict in any meaningful way with Candler's testimony before the ALJ. Similarly, the other information the ALJ relied on – i.e, "He is able to finish what he starts and can follow spoken instructions. He gets along well with others...." – does not conflict in any meaningful way with his testimony before the ALJ.

The most notable potential conflict is between his indication in the functional report that he can walk one to two miles before needing to stop and rest (Doc. #6, PageID at 222), compared with his testimony before the ALJ that he can walk only one or two blocks before

18

needing to stop and rest. This, however, is not much of a conflict because Candler also noted

in his report that if he walked one or two miles he would need to rest for 30 minutes before

resuming his walk. *Id.* And, in light of the ALJ's conclusion that Candler was mostly

credible, the difference between his testimony and his work-function report about his

walking is relatively slight and does not provide a reasonable basis to otherwise discount his

credibility.

Perhaps most significantly, the ALJ's decision does not explain why the reasons she

identified as supporting Candler's credibility do not apply to his testimony about the side

effects of his medications. The ALJ found the testimony presented by Candler and his wife

mostly credible because he had "an excellent work history as well as attempts to return to

work, which enhance his credibility." (Doc. #6, PageID at 52). The ALJ also noted that

Chandler "testified well when asked questions ...." *Id.* The ALJ's findings concerning

Candler's functional report and his testimony are not directly related to and do not cast

doubt upon his testimony that his medications cause him to lie down and sleep two or three

hours per day. The ALJ's decision likewise does not directly connect any evidence of record

to this critical part of Candler's testimony. Such evidence is warranted not only due to the

objective medical evidence underlying Candler's seizure disorder and undisputed need for

prescription Keppra, but also due to the ALJ's finding that both Candler's and his wife's

testimony was mostly credible.

Lastly, the ALJ's ultimate conclusion – *i.e.*, that Candler's "statements concerning

the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent

19

they are inconsistent with the [ALJ's assessment of Candler's] residual functional capacity

assessment" *id.*, PageID at 51-52 – is unconnected to any meaningful evaluation of

Candler's testimony that his medications cause him to lie down and sleep up to three hours

per day. In a sense, the conclusion does nothing to answer why the ALJ credited most of

Candler's testimony but not his testimony about his medication side effect.

Accordingly, for all the above reasons, Candler's Statement of Errors is well taken.[6]

## VII. __Remand for Payment of Benefits__

If the ALJ failed to apply the correct legal standards or his factual conclusions are not

supported by substantial evidence, the Court must decide whether to remand the case for

rehearing or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C.

§405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision

"with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99

(1991). Remand is appropriate if the Commissioner applied an erroneous principle of law,

failed to consider certain evidence, failed to consider the combined effect of impairments, or

failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th

Cir. 1994).

A reversal of the ALJ's decision and a judicial award of benefits is warranted in the

present case, because the evidence of disability is either overwhelming or strong while

contrary evidence is weak. *See Faucher*, 17 F.3d at 176. As discussed above, *supra*, §VI(B),

---

[6] In light of the above analysis, there is no need to reach Candler's remaining argument.

20

the ALJ's decision omits discussion or evaluation of Candler's testimony regarding the specific somnambulant effects his prescription medications cause him. Again, as noted previously, *id*., the ALJ found the testimony presented by Candler and his wife mostly credible, finding that he had "an excellent work history as well as attempts to return to work, which enhance his credibility." (Doc. #6, PageID at 52). The ALJ also noted that Chandler "testified well when asked questions ...." *Id*. "Great deference" is due such findings. *Walters,* 127 F.3d at 531. There is no logical or evidentiary basis for concluding that the ALJ's reasons for crediting most of Candler's testimony do not apply to his testimony regarding his prescription medication side effects – specifically, that his medications cause him to lie down and nap for up to three hours per day. Further, Candler's testimony during the ALJ's hearing was internally consistent, was confirmed in significant part by his wife's testimony, which the ALJ likewise found mostly credible, and was consistent – at times precisely so – with the information Candler previously provided to the Social Security Administration in his April 2008 work-function report. *Id*., PageID at 208-224.

The credibility of Candler's specific testimony about the somnambulant effects of his prescription medications brings into the Step-5 analysis part of the vocational expert's testimony that the ALJ did not address. The vocational expert testified that no jobs would be available in the national economy for a hypothetical person with the residual functional capacity set by the ALJ plus the need to lie down and rest for at least one hour to one hour and a half per day. *Id.*, PageID at 100. Indeed, the vocational expert explained, "Employers do not tolerate that level of ... off-task behavior." *Id.* In light of this unrebutted testimony

21

and the credibility of Candler's credible testimony about the specific somnambulant effects of his prescription medications, all issues have been resolved in this case, and there are no remaining issues to be resolved at the administrative level. This evidence is overwhelming, or strong while contrary evidence is weak, that Candler was under a disability beginning on June 5, 2007 (his claimed disability onset date). Candler is therefore entitled to remand for payment of benefits.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's final non-disability decision be reversed;

2.  Plaintiff Kenneth A. Candler's case be REMANDED to the Social Security Administration for payment of Disability Insurance Benefits, consistent with the Social Security Act, based on the disability onset date of June 5, 2007; and

3.  The case be terminated on the docket of this Court.


August 2, 2013                                  s/Sharon L. Ovington
                                        Sharon L. Ovington
                                        Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).